All right, our next case is Weis v. E&G Weis Farms, Inc., et al., 5-18-0503.  May it please the Court, Your Honor, Mr. Delano, my name is Jordan Campanella, and I represent the defendants in this matter. As the Court is aware, we're here on a preliminary injunction, an extraordinary judicial remedy that should be used in emergency situations. And further, that I'm here under abusive discretion, which I understand is a tough standard. But I'd like to submit to the Court that reviewing the case law, there's much, there's a greater level of review with the review in court when a trial court grants a preliminary injunction as opposed to denying it. And I feel this makes sense because it's such an extreme remedy, it's so rare, it should be narrowly tailored to be handed out in emergency situations. E&G Weis Farms, the defendants, is a corporation, but as you've seen by the fact finder, it's really a family farm, been incorporated, with a mother and three children as the stockholders. And in this matter, as you've seen, the corporation took a different stance on how it was going to be ran in January. It went from farming in-house to now going to have a third party, a crop share. And then it was decided the equipment's not being used, it's only depreciating, sell the equipment. And that's where a plaintiff comes in asking for the preliminary injunction, the extreme remedy that they are requesting. Before the plaintiff can even get to the elements of the preliminary injunction, the actual long-term curve. Not something in the future, but something concrete. And their allegations were four pieces of equipment had been sold well below market value. And hopefully, as my pleadings show, the four pieces of equipment were sold for reasonable value, even by the plaintiff's own appraisal that was done a year before, that was likely higher value because of the depreciation. The four pieces that they allege was a fire seller well below market value didn't occur here. And the evidence didn't show that. But even if this court decides, yeah, defendants should have gotten a little more money for this equipment, the plaintiff still has the high burden, in my opinion, of five elements of a preliminary injunction for this extraordinary relief. One of the five is conceivable. I'm not here to argue about it. The plaintiff has an interest in this matter. He's a minority shareholder. That's nothing to fight about. The other four have to be proven, all four. And I don't think any of the four have been proven by the facts of this case. The first element is irreparable harm. And I submit to the court this is probably the most straightforward element because there's a lot of case law and preliminary injunctions. Irreparable harm, ever since law school, just screams cash. Is cash going to fix it? Is there going to be a problem that if we don't stop this, that we can't fix it with cash? And here I've submitted, and the evidence has shown, that with this four pieces of equipment that were sold, even if it was shown that they should have gotten a little more money, the easy fix is the defense has come up with cash, the corporation, they buy the equipment back, and they're back to being a firm that owns equipment. It's pecuniary. And, you know, I think I feel like I'm a little bit at a loss of not knowing some background with respect to was this going to be an ongoing enterprise, or who was the person, the woman that was essentially running it? Geneva Weiss is the president. She's the majority shareholder. She would be the mother of the three children. She's the mother. Okay. Yes. And there was even statements on the record, no one's planning on selling the family farm. No one wants that. But they did decide to change the outlook of the farm from being in-house, ran by the brother, the planner, as opposed to in the future having no concern. You're not going to contract it out or custom the department? Yes, Your Honor, a crop share. Whether there's no overhead, someone else worries about it. We still make money off the land as a corporation, but we aren't in-house taking that on ourselves. So then the reason why I ask, it's not that the equipment that was sold would need to be repurchased to continue the operation. That's not an issue? In my opinion, no, because the corporation Is that a dispute? The plaintiff disputes that he should have never been removed and he should still be farmed. But the corporation has made the decision to go ahead with the crop share. And he was the president. He was the longest president, and so that's been decided and that has nothing to do with this lawsuit. Are there any other lawsuits? No, that is an underlying claim. The plaintiff is claiming that he was improperly removed. Okay. Yes, Your Honor. So with irreparable harm, I think the plaintiff has failed to show that we can't just fix this with cash, even in the worst-case scenario that I'm wrong and the defendants have sold the property or the equipment for way below market value, that we can't fix it by buying the equipment back. I mean, that's the four events that occurred here that they're basing their preliminary injunction on. We get to the second element of irreparable harm, or second element of a preliminary injunction, which is an adequate remedy of law. And quite frankly, I feel this is the most convoluted element of a preliminary injunction. A lot of courts combine it, but it's been stated that that's separate from irreparable harm. And the best way to describe it, because it's hard to describe, is can the plaintiff ask the court or the defendant ask the court for an adequate remedy of law? Can we ask for something that's reasonable, that we know that will fix something that is concrete and action that will take care of if the wrongs occur? And the best example I would actually use is Mr. Blahney's brief, Sykes-Howard v. Weber. That case dealt with disinterment, which I'd never heard of until I Googled, but it is exhuming a body, digging up a corpse. Trial court ruled inadequate remedy of law. I agree with the trial court and the appellate court upheld it. We're not going to be able to look you straight in the face and say, yeah, a certain amount of cash is going to solve a grieving widow having to dig up her husband. That is a correct inadequate remedy of law example. That is so far away from the fact pattern of what we have for this preliminary injunction of sale of equipment. No digging up of bodies, sale of equipment that can be replaced. And even the plaintiff testified that the equipment was standard. It's not that it was customized and we can't find it again. This is standard equipment. So I think we have an inadequate remedy of law, and the plaintiff failed that element. The third element, likelihood of success on the merits. The plaintiff has to show he's likely to win on his counts. His counts, breach of fiduciary duty, waste of corporate assets, undue influence, and the preliminary injunction that was set here today. As my brief shows, and hopefully I have no argument at this point, that the equipment was sold for fair market value. That it was a reasonable price. There's been no corporate waste. There's no breach of fiduciary duty on the corporate officers. That coupled with, which I believe the trial court did not give enough deference to, the business judgment rule. Which is a strong, strong presumption that corporate officers are doing the best they can. Now there was a lot of testimony and argument that this particular, that Ms. Geneva wasn't the right person to be making those types of decisions based on the fact that she admitted that she didn't have much experience running a farm that the brother did, or that her son did. And that she didn't have a contract, she didn't have any kind of a written contract with the person that was farming the ground for her at that point. So there was no guarantee that they were going to keep farming at that one-third, two-third rate. So that part, how did the judge not take that into consideration? When it comes to, I guess, the first point of the crop share, the majority of farmers, it's an oral agreement. If it's not canceled by October, it just carries on to the next year. This was an oral agreement, and it was testified, and in the fact pattern, and it was actually passed by resolution, that they were hiring the Steele's who farm countless acres throughout southern Illinois. They were going to use their experience, not only to farm, but to handle farm operations and get opinion on that. And I submitted an affidavit that was rejected at the trial court level from one of the Steele's. Ms. Marks testified to, and Ms. Weiss was later on, and Ms. Marks, I think, is who you're referencing, who discussed that, that she had been around farming her whole life. Yeah, her brother had ran it, but farming crops in the field and running a business is two different things. And that's where the difference was with the new vision in the corporation and having to change things up. Ms. Marks testified to getting help and making sure she was informed with working with the Steele's. Ms. Marks also testified, and I apologize, I thought it was Janine that made those comments, but Ms. Marks, if it were she that was making those comments, also stated that she didn't know what the profit margin was when her brother was running it, and she had no idea what the profit margin was going to be. And so, I mean, I understand you're saying she was looking to get help for it, but at the time of this hearing, she didn't have any real understanding of what the farming operation involved. You're correct, and that's why it was spoken to, why the change had to occur, is under the prior running of the farm, no one knew, no information was shared. The only thing that was testified to is the corporate account had $400 when we finally removed the plaintiff, and it was even comments were made by the plaintiff that the corporation and the farm, as he called it, was going bankrupt. You are correct in your statements. The knowledge at that time wasn't, we can point to the plaintiff made $300,000 for the corporation prior year, and we're trying to make more than that. The plaintiff didn't testify to that. He didn't testify to what he made. Who knows if he knew what he made. We don't have that number. So weighing that likelihood of success on the merits, in light of the business judgment rule, over the top of it essentially, showing that unless you're going to show that the new corporate officers have embezzled, have self-dealing, someone's stealing money, something like that, the presumption is they're doing their best, they're doing what they can, and until you show deference, you're not going to get home on that theory. So I think that high burden is what the trial court failed to give deference to, is that the court, the plaintiff, can't in 20-20 hindsight say, yeah, you should have sold this piece of equipment for a couple thousand more. That's not the case when it comes to corporations. They're hard enough to run the way they are. No one's going to make a perfect decision. You just have to do your best under the circumstances they are. The last element. Well, even if it was sold for too little money, by a couple thousand dollars, just taking that, isn't that a remedy would be a couple thousand dollars? Yes, Your Honor, and that's from the first element that the rep will harm. I feel like leads to the rest of this. If that's the damages, that's where it is, with a catch. I know in the underlying transcript and the underlying hearing they went to other issues, but at the most basic point of this, what they bring is saying we've got four acts, not separate acts, but four pieces of equipment that were sold. That's what we have to enjoy. Those are the acts. You can't ask for the future. And if that's the four that the trial court's ruling on and should have been ruling on, then the answer is a couple thousand. Like I said, no matter if it's a rep will harm, success in the merits, or inadequate remedy law, because I agree a lot of these elements are very similar. They're just little nuances between the five. The last element is balancing of the hardships. And when I go through these elements, I would like to remind all five have to be met, not one, two, three, four, not majority, all five. And this balancing of the hardships is the biggest issue I probably have with all the elements, even with the catch. And the reason for that is you've got to balance that the plaintiff is going to be harmed more than the defendant if you're going to give a denunciation against the defendant. Here the trial court failed to rule on it. I understand that the plaintiff in his response says, well, the trial court did that. Here's the quotes. But he does not show, which the record does, that was a pre-printed order handed to the judge immediately upon the hearing it's signed. Not that it had been ruled upon evidence presented. Because if you look to page 91 through 94, the trial court goes through its ruling through all the prompts. It says this evidence, in my opinion, goes here, gets it done. This one goes here, gets it done. Goes through four. Never says a word about balancing the hardships in his oral ruling. He didn't consider the evidence. Because if he would have considered the evidence here, there's no way that freezing or likely handcuffing the corporation indefinitely is going to be of less harm than the plaintiff either getting the equipment back, getting cash for the equipment back, or putting the plaintiff back in charge, even though he's a minority shareholder, if that's what ends up happening, would cause more harm on that side as opposed to the corporation not being able to carry on its daily duties, especially with the equipment that's going to continue to depreciate that's not being used. So what kind of testimony was there with respect to the hardships? I believe the plaintiff testified that the corporate stock would be reduced and that could be weighed in it. The equipment being gone and not being able to run the farm in-house would be a hardship. But other than those two factors, I cannot recall right now. What did the defendant argue with respect to hardship? One, the main thing was, because the whole focus was on these pieces of equipment, was that we're going to have equipment that is sitting stagnant. That's a significant amount of equipment that's going to continue to depreciate until the court allows us to get rid of them because we're not using them. And the longer they don't get used, either one, there's going to be more issues with them mechanically, and two, it's going to be apparent that something that's worth X amount of dollars a day, vehicle equipment-wise, is going to be worth less next year. I know the plaintiff testified to a self-serving statement that due to tariff increases, that equipment had increased 15 to 30 percent prices since a year and a half before the appraisal was done. But I find it hard to believe because if that was the case, I'd be turning in my car immediately and getting 30 percent more than it's worth. But other than that, there's, under that, that was the hardship, so it wasn't much discussed, and that's likely why the trial court didn't address it or they didn't feel the evidence was there. But that is lacking from this decision at the trial court. With those elements, five of them, as I stated, even if, because I disagree, that corporate officers sold equipment for less than or way below market value, as the plaintiff suggests, but even if they have, they have not met those five elements. They've met one, he's got an interest. The other four, they have not met the burden. The evidence didn't get there. Policy reasons to allow a disgruntled minority shareholder to freeze up a corporation or seemingly handcuff a corporation from running a day-to-day business is bad policy. And that's why I'm here asking for the trial court's ruling of a preliminary injunction to be overturned. Thank you, and I'll reserve any time I have for another one. Thank you. Mr. Bryant. May it please the court, counsel. Let me, before you start, I keep failing to do this before we start these. Obviously, there are only two units. The two of us are here today. Justice Case is also a member of our panel but was unable to be here today and will be participating via the recordings. So just so you know, there's not just two of us making this decision. Thank you. My name is Hank Galani, and I represent the plaintiff, Gary Weiss, in this case. A little background here, I believe, would be very helpful. This is a particular, this is a farming corporation. It's a family farm. Geneva Weiss and her husband started this particular corporation more than 40 years ago. The corporation owns hundreds of acres, not quite 1,000 acres of land. They own, the corporation owns an extensive amount of farm equipment, appraised at well over $1 million in 2017. The farm corporation has been engaged in the active farming of this land as well as multiple other parcels of land that they do on a sharecropping basis. So in those cases, the farm, Mr. Weiss, now deceased, and his son, Gary Weiss, worked together and farmed a lot of other acreage on a sharecropping basis where they were getting two-thirds and those landowners were getting one-third, which is the agreement that was reached by the defendants in this particular case. Now, Mr. Weiss, Eugene Weiss, died in June of 2016. Not long after that point in time, a dispute arose within the next year between the plaintiff and his sister, Ms. Marks, in this particular case. The dispute primarily surrounded her wanting a son to obtain some acreage from the farm. He refused. And I want to tell you, this information is not included in testimony. I'm giving it to you by way of a little bit of background and for nothing more. It has nothing to do with the case other than that. It's been produced in discovery that was conducted since the preliminary injunction was entered. To the extent that it's not in the record, we can't consider it. I agree. So there's bad blood that was there. Shortly after, we figured when there was a family farm dispute that there was bad blood. It always ends up that way, doesn't it? So Ms. Weiss, Geneva Weiss, had some difficult times, and she testified that under oath in the hearing. She testified that she didn't remember making certain decisions that affected the farm. Back at the time, it was determined that Mr. Weiss was going to be, my client, was going to be removed as a director and as an officer of the farming corporation. She didn't remember changing attorneys or why it was done. There was a number of things, and the judge, in these cases, as you're aware, the trial court is in a different position where they are able to watch witnesses and determine the credibility and see what's going on. And that is something that I believe here is priceless. The testimony that Geneva Weiss gave on that particular afternoon clearly reflected that she didn't have full memory. She didn't have, prior to that time, prior to having her son removed from the corporation, was taken from a home, placed in an assisted living center in DuQuoin. Diane Marks, one of the other defendants, owns a business, resides in DuQuoin, and is her agent under a power of attorney. There is an undue influence. There is an undue influence count here, and it is a prima facie case. I'm not going to get into that whole argument here today, but I think it is certainly a meritorious count of the underlying complaint, which also includes two different counts under a shareholder derivative action. The shareholder derivative action is based largely in part because none of the corporate formalities were followed when my client was removed as a director and an officer of the corporation. Attached as exhibit to the original transcript and also, I believe, in the plaintiff's, or excuse me, defendant's appellant's brief, were some memorandums, resolutions that were entered, same ones that were provided to my client at a meeting on January 8, 2018. These particular memorandums reflect that my client was removed, and he was present initially at this meeting, told he was removed, and asked to leave the meeting, which he did. There was no discussion of whether or not there was any cause for removal, which is required under the bylaws, which are also attached to the appendix filed with appellant's brief. There was also no provision for removal of a director. There was also no voting on amending the bylaws to reduce the number of directors. What I'm getting around to is what is important about all of that is simply that those actions were undertaken in bad faith and fraudulently, and certainly with undue influence. Geneva can't even remember any of these things occurring or taking place. How old was she? In her mid-90s. Nice lady, wonderful lady, but admittedly has gone through a hard time since her husband's death and is struggling. So we have the disenchanted sister who has a personal grudge against the plaintiff, my client, and the first thing that she does is, by God, I've got mom's power of attorney now, we're going to have a meeting, and we're going to remove you, and you're going to have nothing more to do with this farming operation. So my client, who has farmed nonstop with his father, and since he was a child farmed this farming operation with his father, but nonstop since 1991 and has operated it, has never charged the corporation any of the income received by the corporation for land it owns that he farms, that he and his father farm. All of the corporation, unrefuted testimony, was paid by the sharecropping that was done. But the corporation also gleaned income from that sharecropping. So the sharecropping, it didn't take all of what was being done to pay my client. So what happened to the income from the land the corporation owned? It goes back to the corporation. Now, if you look at the unrefuted testimony, there's two years' worth of wheat and one year's worth of beans that were still being held. That is grain. So from 16 and 17 on the beans were being held in grain silos owned by the corporation. They had extensive storage. This is a large farming operation, multiple storage facilities, a lot of equipment. About that grain, there was a testimony that it was sold for less than it could have been sold for because there was mold and other problems with it from the storage area. Was that alleged to have occurred because of the lack of being taken care of properly or was it some other aspect? My client's position on that, Your Honor, was yes. He was removed. He was told in December not to come back on the farm. He didn't show up for the meeting and was again told in 2017. The testimony, I believe, was that sometime in late March or April was the first time the bins had been opened up since he was removed. If you're familiar with farming, the bins have ventilation systems, fans. They must be run, particularly once the weather starts to warm up a little bit. Throughout that entire period of time, subsequent to my client's removal from the corporation and being barred from coming onto the property, those fans were never run. There's a good reason why some of that wheat started to go bad. Now, the wheat properly cared for, ventilated, those issues would never have occurred. So again, that is something that our position is additional waste or damages. We're not arguing that here before you today, but that is something that is within our underlying complaint. So the irreparable harm aspect, money alone cannot fix this particular problem. What the defendants have done here is they've changed the entire characteristic of the corporation. So it is no longer an ongoing farming operation. It is simply a corporation that owns land that they are sharecropping. And so you go from getting full value, 100 percent of the value of the grain and products that are harvested and sold from the farm to getting one-third. You have a lot of equipment. My client's testimony was that he and he alone operated and repaired and worked on and maintained all of that equipment. So you've gone from a situation where you've got a guy that is actively involved in the farming operation, maintains all of the equipment, keeps it running, keeps... I think you were talking about painting and repairs and some other things in his testimony, which is unrefuted, to being banned from the property and no longer being able to even come on there to maintain equipment, machinery, or anything else. One of the things, and especially for money damages, just as an illustration of just how inadequate or difficult that would be to calculate in this particular case, there was a motion for leave to supplement the record that was filed and the court granted. Exhibit F of those particular exhibits was an actual appraisal that was done in 2017, the spring of 2017. It reflects values, both wholesale value and average resale value. And if you look at the testimony throughout the entire hearing, defendants want to use resale value, or excuse me, wholesale value. They want to use that as a benchmark for what they sold the equipment for. And you can look, and there's three particular items that are on this list that were sold. There was actually five items sold. There was also a drill, and there was a tractor and a trailer. Two of those items have not yet been paid for. So there was an agreement for sale, but there's actually five, not four. And Ms. Marks testified that it was her intention to sell off every last piece of equipment, which is what exactly made this an emergency. If this was limited to just the sale of these several items of equipment, $100,000, yeah, you could probably get or come close to getting some of these things back, which is the amount in the corporate account right now. It would be a little bit more than that, but they could afford to do it. If you look at the wholesale values versus average retail values on that particular exhibit, which is what they want to use, the Demco green cart, wholesale value $22,500, average resale value $26,800. So the argument is being made, well, you can, you know, for $4,800, you can come up with an adequate remedy at law. But if you continue, the drill, $22,500, wholesale, average resale, $28,500. It was sold for, I believe both of those items were sold for $25,000, so a little less than what the average resale value was. And by the way, none of this was sold through any advertising or auction or anything else. This was done solely through word of mouth. The steels who were farming the land for the defendants knew some people who they thought might want to buy this. They contacted them, and sure enough, they jumped all over it and bought it that quick. Then we've got this BB Magna spread, a spreader, wholesale value $25,000, average resale value $35,000. So there was quite more of a discrepancy there. But if you look at some of the other items of equipment, if you look at the tractors, at the combines, at everything else that the defendants have testified that they want to sell all of, then you start getting into discrepancies of more than $50,000 just between the wholesale and average resale prices. So once you start adding all of that up, and then you try to come back and decide, okay, well, how much revenue was lost? And there was a question that was asked of the defendant by myself, and that was, how much was your net income? What did you make? And the answer was, I don't know. I don't have any of that information. She could not compare what the income was when the plaintiff was operating the farm and doing the farming versus what happened when she took over. And by the way, I'm not going to spend a lot of time getting into the whole business judgment rule argument. I think my brief adequately addresses that particular issue. But that is a non-argument in this particular case. None of it. You have to have a good faith basis for your judgment in order for the business judgment rule to apply, and none of that was present in this particular case. Ms. Marcy even testified that her brother did a good job. Yes, she did. She can't refute that. And that's why it's sad. I see this in a lot of the business and estate work that I do on a regular basis. You have disgruntled family members. That is exactly what the case is here. The father, even within his trust, there's a directive that land not be sold, that everything be kept together. The son was actively farming this with his father. As soon as the father dies, boom, less than a year and a half, all of a sudden the son is removed. The operation is changed entirely. And now you've got someone who wants to get all of the money out of it and not wait on any inheritance. Let's sell it off, let's distribute it, and then whatever we get from the ongoing farming is just fine. But that is not the character of what the corporation was set up to do. That was not the purpose of the corporation. Geneva, bless her heart, cannot say much one way or another. She has no independent say in this. Everything that is being told to her, and in fact there's testimony to this effect by Ms. Marks, is being told to her by Ms. Marks one-on-one, privately, no one else. In fact, my client is unable to even visit with his mother outside of supervision by Ms. Marks. So this case, if ever there should be a preliminary injunction, injunctive relief entered, this is that case. Because this farm is no longer going to exist if defendants have their way, everything will be sold off as quickly as possible, distributed, and then how can this farm ever return to being a farming operation as opposed to just a sharecropping landholder? It can't. There's no money that would be there to be able to do that. And the corporation does not have that much borrowing power to buy back over $1.1 million worth of equipment. So for all of those reasons, and if you have any other questions, I've not addressed all of the elements of the case. I believe that the synopsis I gave is the background and the facts, as well as looking at the appraised values that are touted by the defendants. I believe that all of the elements are met, and I believe Judge Grace went into great detail in his verbal decision addressing the parties at the conclusion of testimony as to why he was ruling the way he was ruling. And I do not believe that the court can find that there was an abuse of discretion by Judge Grace in this particular case. I believe his reasoning was well thought out, well spoken. He considered all of the elements, and clearly he also reviewed very carefully the proposed order that was presented to him. It took more than just a few minutes looking at that before he signed it. It wasn't something that he accepted and put his signature on. I found him to be a very thorough judge, a very complete judge, a very fair judge, and I believe he made the right decision in this case. Thank you. Let me ask you one last question, one parting question. Were you the attorney for the corporation when the father or the brother ran it? No, I was not. There was a firm that I'm sure you're familiar with in Vandalia that has been around for many, many years. That particular firm has been doing it. They were blindsided. I've spoken to them by the removal. Is it the Campanella firm that is now acting as the secretary? The Campanella firm is now acting in that role, yes. Okay. Thank you. Thank you. Do we have time for one more? Thank you, Your Honor. To highlight and just hit the points Mr. Vandalia has just went through, he asked for Geneva's testimony. She is 90-plus years old, and we'd sat there for an all-day hearing. And when she testified, she was exhausted, and you can see that through her testimony. But going to the next step, without further evidence to say that Ms. Marks is telling her everything to do, and she's, I guess, signed her name and everything. The corporate resolution is what was done to remove the plaintiff. Geneva was there. She signed it herself. She was right in front of the plaintiff. So was the other sister. The entire family was there. It's not that Ms. Marks was by herself with Geneva doing these things behind closed doors. Everybody was in the same room. Has Geneva been found incompetent in court? No. So she has a power of attorney, personal guardianship or anything? No. I haven't even found that there's a power of attorney for property over her. He alleges that. I don't have one. Okay. And there's actually testimony that the doctor I tried to submit evidence was rejected said, no, there's no dementia. They argue that in the petition, but she's never had any medical history to have no evidence of that whatsoever, that she's got dementia. There's no medical evidence of that. So to frame this as Geneva's just wandering around not knowing what she's doing, the evidence hasn't shown that. It's not going to show that at the end of this case. They're mere allegations. And he attaches bylaws to his complaint. He's right. Those bylaws don't include those provisions, but he doesn't attach the amendments that's been done to those bylaws. Those are just allegations saying that he was improperly removed. But that's bylaws from 1974, I believe. Well, where are the amendments from? When? December 2017. Which were not attached to it. Prior to his removal or after? Yes, prior. But there were amendments that allowed for the removal. They had to be amended to do. The no cause, he says right now you have to have cause. That was amended to where the person get removed for no cause. The steps were taken. So, yes, he was correct with his attachment, but there's been amendments to those bylaws that allowed the corporation to do what the corporation did. The mold on the grain. There was testimony by Ms. Marks and with the help of the Steeles that the mold and the defects that occurred on the grain wasn't something that happened in a couple months. It was a long time building. And we're talking a couple months from when the plaintiffs took over in January to when it was discovered in March or April. There's been no testimony or evidence saying that the fans weren't run. The only testimony was that's the first time they opened it up and saw, oh, no, this has got a long time period of mold, weasels, et cetera, to where the Steeles had to get in there and clean it up for sale. The plaintiff keeps saying resale value. That's an incorrect standard. Resale value's definition is a car dealership or an equipment dealership where they're going to sell to the public. I understand wholesale is the bottom. But wholesale is closer to what a reasonable value is than resale would ever be, especially with the EMA being removed from the wholesale value. Isn't there an argument being made as far as money damages being adequate or repurchasing the equipment as being adequate that you're not going to go out and buy it in wholesale, you're going to probably have to buy it for retail, right? Well, if you get it at an auction, the auction price is closer to a wholesale. I bought a lot of junk at auctions, but I never bought anything good. And he mentioned an auction price, if they would have gotten an auction price. Research and definitions, auction price is closely to wholesale. That's roughly what you're looking at. Resale is a much different ballgame. That's shown by also the magna spread. He wants to say resale value. The plaintiff purchased that magna spread for $18,100. That was testified to in 2016, no, 2017. A year later, the defendant sold it for $25,000. That's a $7,000 gain on what he sold it for. And that's one of the four that the complaint is on the equipment. And he's right. Ms. Marks said the plaintiff did a good job. She also said he did a good job farming, giving the crops out and fertilizing. But when it comes to running the monetary aspect of the corporation, Ms. Marks never said he was good at that. She also said that she had no idea what the problem was. You're right. So she couldn't really say if he was good or if he was bad. Yes, her opinion was just weighed on the fact of the bankruptcy statements and the $400 in the corporate account, leaving her to believe and her mother at that point that we were in trouble. Okay. All right, well, thank you very much. You're welcome. The court will take this matter into consideration and issue its ruling in due course.  Thank you.